U.S. BANKRUPTCY COURT
District of South Carolina

Case Number: 09-03549

ADVERSARY PROCEEDING NO: 09-80114

ORDER

The relief set forth on the following pages, for a total of 11 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**02/01/2010**



US Bankruptcy Court Judge
District of South Carolina

Entered: 02/01/2010

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Phoenix Electronic Mfg. Services, LLC,<br><br>                              Debtor(s). | C/A No. 09-03549-JW<br><br>Adv. Pro. No. 09-80114-JW<br><br>Chapter 11<br><br>**ORDER** |
| Assembly Technologies, Inc.,<br><br>                              Plaintiff(s),<br><br>v.<br><br>Phoenix Electronic Mfg. Services, LLC,<br><br>                              Defendant(s). | |

This matter comes before the Court on the motion for summary judgment ("Motion") filed by the Plaintiff, Assembly Technologies, Inc. ("ATI"). The Defendant, Phoenix Electronic Mfg. Services, LLC ("Phoenix"), filed an objection to the Motion. Pursuant to Fed. R. Civ. P. 52, made applicable to this proceeding by Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law.[1]

**FINDINGS OF FACT**

1.     On December 29, 2006, Phoenix entered into a "Business Lease Agreement" with ATI for the lease of certain assets owned by ATI ("Agreement"). The Agreement provides, in relevant part, that:

> WHEREAS the parties intend to enter into an Asset Purchase Agreement … pursuant to which Phoenix intends to purchase certain assets of ATI (the "Assets") and operate the business currently operated by ATI (the "Business") with such Asset Purchase Agreement currently subject to the approval of the United States Internal Revenue Service; and

---

[1]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the conclusions of law constitute findings of fact, they are also adopted as such.

WHEREAS Phoenix desires to commence operating the Business prior to the purchase of the Assets; and

WHEREAS the parties intend that Phoenix shall operate the Business prior to the purchase of the Assets, as if the purchase had occurred;

NOW, THEREFORE, for and in consideration of the mutual promises contained herein and for such other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. ATI leases all the Assets described in "Exhibit A" … to Phoenix. The Lease is made effective April 1, 2006 ("Effective Date")….

2. Phoenix shall operate the Business and utilize the Assets. Phoenix shall be entitled to all income generated in connection with said operation after the Effective Date.

3. In consideration of this Lease, Phoenix shall pay ATI pursuant to the schedule set forth in Exhibit "B".[2] All payments made pursuant to this Lease shall be credited against the payments required under the Asset Purchase Agreement.

4. Phoenix shall be responsible for all taxes, licenses, and operating expenses in connection with the operation of the Business, including but not limited to building and equipment leases, utilities and wages, and which originate with the start of the Effective Date of this Lease.

5. Phoenix shall conduct the Business, but shall not take any extraordinary actions outside the ordinary course of business without the consent of ATI. Assets leased hereunder may not be transferred, assigned, or encumbered by Lessee.

6. …

7. Phoenix may terminate this lease following sixty (60) days notice to ATI. Either party may terminate this lease upon a material breach by the other party.

2. The property that is the subject of the Agreement is set forth in detail in Exhibits A, B, and C, and generally consists of equipment, fixtures, furniture, interests under

---

[2] The payment schedule is set forth in Exhibit "2" to the Agreement. The reference to Exhibit "B" appears to be a scrivener's error.

2

contracts, proprietary rights, intellectual property rights, intangibles, and inventory (the "Assets").

3. Exhibit D to the Agreement indicated that the business operations were expected to generate $1.5 million in sales in Year 1 of the Agreement, $1.8 million in Year 2, $2.0 million in Year 3, and $2.2 million in Year 4.

4. Exhibit "2" to the Agreement required Phoenix to make an initial payment of $45,000.00 to ATI on December 29, 2006 (representing the first nine monthly payments), and monthly payments, beginning January 1, 2007, according to the following schedule:

| Months 1-12 | $5,000.00 |
| Months 13-36 | $8,000.00 |
| Months 37-48 | $8,166.00 |
| Months 49-60 | $8,000.00 |

Exhibit "2" further provides that "[p]ayments under the Business Lease shall be made… until the Asset Purchase Agreement is closed and payments are made thereunder."

5. The parties did not enter into an Asset Purchase Agreement.

6. Phoenix filed a petition under chapter 11 of the Bankruptcy Code on May 8, 2009.

7. In its schedules, Phoenix listed ATI as an unsecured nonpriority creditor and characterized the debt as a "lease." Phoenix does not list in its schedules that it has an executory contract or unexpired lease with ATI, nor does it propose to assume an executory contract or unexpired lease with ATI in its plan of reorganization.

3

8. Phoenix listed in Schedule B equipment with a total value of $74,515.00. The detailed listing of equipment attached to Schedule B includes the same equipment that was listed on Exhibit A to the Agreement.

9. In connection with its Motion, ATI filed an Affidavit of Jim Shealy, the chief executive officer and owner of ATI, stating that the parties intended the Agreement to be true lease. Mr. Shealy states that the parties initially wanted to conduct a straight sale of the business, but ATI could not sell without permission from the United States Internal Revenue Service (IRS). The sale was put on hold until ATI could get approval from the IRS. In the interim, Phoenix wanted to begin operating the business, so the parties negotiated a lease agreement by which Phoenix could lease the business until such time as the sale was approved by the IRS.

10. Phoenix asserts that the Agreement is a security agreement disguised as a lease. No affidavits were filed by Phoenix in opposition to the Motion.

## CONCLUSIONS OF LAW

*I. Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c), which is made applicable to this proceeding by Bankruptcy Rule 7056, provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The moving party bears the

4

initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). Once the moving party has met this burden, the burden shifts to the non-moving party to come forward with specific facts demonstrating that a genuine issue exists for trial. T 2 Green, LLC v. Abercrombie (In re T 2 Green, LLC), 363 B.R. 753, 763 (Bankr. D.S.C. 2006)(citing Listak, 977 F. Supp. at 742). As here, "[w]here a movant supports its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant must proffer countering evidence sufficient to create a genuine factual dispute." In re Dig It, Inc., 129 B.R. 65, 66 (Bankr. D.S.C. 1991). Rule 56(e)(2) provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." If the opposing party is unable to make such a showing, summary judgment should, if appropriate, be entered against that party. Fed. R. Civ. P. 56(e)(2)

> II. *The Agreement is not a Security Agreement as a Matter of Law Pursuant to the Bright Line Test set forth in S.C. Code Ann. § 36-1-201(37)*

ATI seeks summary judgment on the issue of whether the Agreement is a true lease. Phoenix asserts that the Agreement is a security agreement disguised as a lease. Due to the nature of the property addressed by the Agreement, the determination of whether Phoenix's Agreement with ATI is a security agreement or a true lease is governed by state law, specifically South Carolina's version of the Uniform Commercial Code. In re Parker, 363 B.R. 769, 772 (Bankr. D.S.C. 2006). S.C. Code Ann. § 36-1-201 (37) (West 2003) provides:

> (A) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to

5

  possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

   (1) the original term of the lease is equal to or greater than the remaining economic life of the goods,

   (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

   (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

   (4) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

  (B) A transaction does not create a security interest merely because it provides that

   (1) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

   (2) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,

   (3) the lessee has an option to renew the lease or to become the owner of the goods,

   (4) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

   (5) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

"As a matter of law, a security interest is created if the lessee does not have the right to terminate the agreement and one of the factors in [S.C. Code Ann. § 36-1-201(37)(A)(1)-(4)] is present." Parker, 363 B.R. at 773. If the agreement does not meet the *ipso facto*

6

designation as a security interest, then the Court must examine the facts of each case to determine whether the agreement is a true lease or a disguised security agreement. Id.

In this case, the Agreement provides Phoenix the right to terminate the agreement following sixty (60) days notice to ATI. Phoenix does not dispute that it had this right under the terms of the Agreement. Since the first prong of the bright line test set forth in S.C. Code Ann. § 36-1-201(37) is not met, further examination of the remaining factors set forth in the statute is not required. Accordingly, the Agreement does not create a security interest as a matter of law.

*III. The Agreement is a True Lease Under the Facts of this Case*

Having determined that the Agreement is not a security agreement under the bright line test set forth in S.C. Code § 36-1-201(37), the Court must examine the facts of this case to determine whether the nature of the Agreement is that of a security agreement or a true lease. See id. at 775; see also In re Gateway Ethanol, LLC, 415 B.R. 486 (Bankr. D.Kan. 2009)("[C]ourts and commentators agree, that even if the bright line test is not satisfied, the courts must apply a second test, examination of the specific facts of the case to determine whether the economics of the transaction support such a result.") The focus of this analysis is whether ATI retained a meaningful reversionary interest in the goods leased. "If there is no reversionary interest or the reversionary interest is insignificant, the transaction is a sale rather than a lease." Id. (citing 4 James S. White & Robert S. Summers, Uniform Commercial Code § 30-3 (4th ed. 2002)). This Court has previously considered the following non-exclusive list of factors to determine whether a creditor retains a meaningful reversionary interest in the goods leased: 1) whether the lease is terminable at will by the lessee; 2) whether the lessor has the duty to repair; 3) whether the lessee is compelled to

7

purchase the goods at the termination of the lease; 4) whether mandatory payments due under the lease are equal to or greater than the value of the leased goods; and 5) whether the useful life of the leased property exceeds the term of the lease.  Parker, 363 B.R. at 775.

The application of the foregoing factors to the facts in this case supports a conclusion that ATI has a meaningful reversionary interest and thus the Agreement is a true lease.  The material facts are not in dispute. The Agreement provides that Phoenix may terminate the Agreement at will and without cause following sixty (60) days notice.  Further, Phoenix may terminate the Agreement immediately if ATI defaults on its obligations under the Agreement.  Thus, the first factor supports a finding that ATI has a meaningful reversionary interest since Phoenix has no obligation to continue in the Agreement if it wishes to end its relationship with ATI.

The Agreement does not specifically address whether Phoenix is obligated to make repairs, but it does provide that Phoenix is responsible for all taxes, licenses, and operating expenses in connection with the operation of the Business, including but not limited to building and equipment leases, utilities and wages, which could reasonably be viewed as requiring Phoenix to pay costs associated with making repairs.  Viewing the facts in the light most favorable to Phoenix, this factor could weigh in favor of finding that the Agreement is not a lease. However, S.C. Code Ann. § 36-1-201(37)(B)(2) provides that a transaction does not create a security interest merely because it provides that "the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods." Thus, the second factor is neutral.

Although the Agreement provides that a sale of the Assets to Phoenix is contemplated, it does not require Phoenix to enter into an asset purchase agreement.

8

Phoenix argues that the provision of the Agreement that states that all payments made by Phoenix to ATI shall be credited against the payments required under the Asset Purchase Agreement shows the parties' intent for the "lease" to have the force of a financing agreement.[3] However, the Agreement makes no provision for the purchase of the assets. The language of the Agreement clearly demonstrates that, while the parties intended to execute a separate agreement to purchase the assets in the future, the execution of the asset purchase agreement was contingent upon the United States Internal Revenue Service's approval of the sale. It is undisputed that this contingency was not met. No provision of the Agreement compelled Phoenix to execute an asset purchase agreement upon termination of the Agreement or at any other time. Thus, the third factor supports a finding that the Agreement is a lease.

The Agreement required Phoenix to make an initial payment of $45,000.00. Monthly payments of $5,000.00 were due on the first day of each month from January 1, 2007 through March 1, 2007. Thus, if Phoenix had decided to terminate the Agreement immediately after it made its first payment and to give ATI sixty 60 days notice, Phoenix's mandatory payments under the Agreement would total $55,000.00, comprised of the initial payment of $45,000.00 and two monthly payments of $5,000.00. Phoenix listed in Schedule B equipment with a total value of $74,515.00. The detailed listing of equipment attached to Schedule B includes the same equipment that was also listed on an exhibit to the Agreement. Exhibit C to the Agreement also indicates that it included inventory with a total value of $26,926.42. Exhibit D to the Agreement indicated that the business operations were

---

[3] The Court notes that the current version of the S.C. Code § 36-1-201(37) contains no reference to the parties' intent. The 1988 amendment to this section eliminated reference to the intent of the parties to create a lease or security interest and changed the focus to the economics of the transaction. S.C. Code § 36-1-201, Official Comments ¶ 37 (2003).

9

expected to generate $1.5 million in sales in Year 1 of the Agreement, $1.8 million in Year 2, $2.0 million in Year 3, and $2.2 million in Year 4. Therefore, the record indicates that the value of the leased assets exceeded this initial mandatory payment. This factor also weighs in favor of a finding that the Agreement is a lease.

Furthermore, since the Agreement covers the lease of a business as a going concern, with its equipment, business contracts, and inventory, the Court can reasonably infer that the assets have a useful life beyond the term of the Agreement, which had a maximum term of 60 months. This factor also supports a finding that the Agreement is a lease.

Additionally, there are other facts that support the conclusion that the Agreement is a lease. The Agreement provides that Phoenix shall not take any extraordinary actions outside the ordinary course of business without the consent of ATI and that the assets leased under the Agreement may not be transferred, assigned, or encumbered by Phoenix. The Agreement also provides that ATI is entitled to a percentage of gross sales to the extent that the gross sales exceed the forecasted gross sales for that forecast year. Both of these provisions support a finding that ATI retained a reversionary interest in the assets leased under the Agreement. Further, the parties titled the Agreement as a "Business Lease Agreement" and referred to themselves within the Agreement as "Lessor" and "Lessee." Phoenix also characterized ATI's interest as a "lease" and listed ATI as an unsecured creditor in its Schedules.

Considering the totality of the circumstances, the Court finds that the Agreement is a true lease and not a disguised security agreement. Accordingly, it is hereby

ORDERED that ATI's motion for summary judgment is granted.

**AND IT IS SO ORDERED.**